RECEIVED
OCT 27 2021
TONY R. MOORE CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | 3:21-cr-00271-01 |
| | * | |
| VS. | * | Judge Doughty |
| | * | Magistrate Judge McClusky |
| MICHAEL ANSEZELL TOLLIVER | * | |

**INDICTMENT**

THE GRAND JURY CHARGES:

**COUNTS 1-2**
**Wire Fraud**
**[18 U.S.C. § 1343]**

**AT ALL TIMES HEREIN RELEVANT**

**The Defendant and Relevant Entities**

1. The defendant, **Michael Ansezell Tolliver**, was a resident of Ouachita Parish, Louisiana.

2. Tolliver Oil & Gas Corporation of Louisiana Inc. ("Tolliver Oil & Gas") was a Louisiana corporation registered in or around 2007.

3. Tolliver Petroleum Corporation of Louisiana ("Tolliver Petroleum") was a Louisiana corporation registered in or around 2020.

4. Bank 1 was headquartered in Louisiana and maintained branch locations in Louisiana and elsewhere.

5. Bank 2 was headquartered in New York and maintained branch locations throughout the United States.

6. Bank 3 was headquartered in New Jersey and maintained branch locations throughout the northeastern United States, all of which were outside the state of Louisiana.

7. Bank 4 was headquartered in California and maintained branch locations outside the state of Louisiana.

### Small Business Administration

8. The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

9. As part of this effort, the SBA facilitated government-backed loans through banks, credit unions, and other lenders.

### The Paycheck Protection Program

10. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

11. In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application, signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) was required to state its average monthly payroll expenses and its number of employees, among other things. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation showing their payroll expenses.

12. A PPP loan application was processed by a participating financial institution ("lender"). If a PPP loan application was approved, the participating lender would fund the loan using its own monies, which were guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

13. PPP loan proceeds were required to be used by the business on certain permissible expenses, including payroll costs, mortgage interest, rent, and utilities. Under the applicable PPP rules and guidance, the interest and principal on the PPP loan was eligible for forgiveness if the business was eligible for the PPP loan it received, spent the loan proceeds on these permissible expense items within a

designated period of time, and used a certain portion of the loan proceeds for payroll expenses.

14. Bank 3 and Bank 4 participated in the SBA's PPP as lenders and, as such, were authorized to lend funds to eligible borrowers under the terms of the PPP.

### The Economic Injury Disaster Loan Program

15. The Economic Injury Disaster Loan ("EIDL") Program was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

16. The CARES Act authorized the SBA to provide EIDLs up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL. The amount of the advance was determined by the number of employees the applicant certified having. The advances did not have to be repaid.

17. In order to obtain an EIDL and advance, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as: (1) the number of employees, (2) gross revenues for the 12-month period preceding the disaster, and (3) cost of goods sold in the 12-month period preceding the disaster. The 12-month period for EIDLs for COVID-19 relief was from January 31, 2019 to January 31, 2020. The applicant was also required to certify that all the information in the application was true and correct to the best of the applicant's knowledge.

18. EIDL applications were submitted directly to the SBA and processed by the agency with support from a government contractor, Rapid Finance. The amount of the loan, if the application was approved, was determined based on the information provided by the applicant about employment, revenue, and cost of goods, as described above. Any funds issued under an EIDL or advance were issued directly by the SBA. EIDL funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments. If the applicant also obtained a loan under the PPP, the EIDL funds could not be used for the same purpose as the PPP funds.

### The Scheme to Defraud

19. **Tolliver** devised a scheme and artifice to defraud the SBA and various financial institutions, including Bank 3 and Bank 4, by:

(1) falsifying PPP and EIDL Program loan applications, forms, and other documents ("fraudulent loan applications");

(2) submitting and causing to be submitted fraudulent loan applications to Bank 3, Bank 4, and the SBA in order to obtain funds through the PPP and EIDL Program; and

(3) receiving and obtaining payments and benefits from Bank 3, Bank 4, and the SBA based on the fraudulent loan applications submitted.

### Purpose of the Scheme

20. The purpose of the scheme and artifice was for the defendant to unjustly enrich himself and others through the submission of the fraudulent loan applications.

## Manner and Means of the Scheme

21. The manner and means by which **Tolliver** sought to accomplish the objects and purpose of the scheme and artifice included, among others:

### *Tolliver Oil & Gas EIDL Application*

22. On or about April 4, 2020, **Tolliver** electronically submitted and caused to be submitted to the SBA a false and fraudulent EIDL application in the name of Tolliver Oil & Gas, seeking approximately $150,000 in EIDL Program funds ("Tolliver Oil & Gas EIDL Program application"). **Tolliver** signed the Tolliver Oil & Gas EIDL Program application and certified that the application and all information provided was true and accurate.

23. In the Tolliver Oil & Gas EIDL Program application, **Tolliver** falsely represented that the business had 50 employees and that its annual gross revenue was approximately $1,142,408.

24. In the Tolliver Oil & Gas EIDL Program application, **Tolliver** also used the Social Security Number of a deceased person as his own.

25. At the time of the EIDL application for Tolliver Oil & Gas, the company was administratively terminated by the Louisiana Secretary of State. As **Tolliver** knew at the time that he submitted the Tolliver Oil & Gas EIDL Program application, Tolliver Oil & Gas had no employees or annual revenues.

26. Based on **Tolliver's** material misrepresentations set forth in the fraudulent Tolliver Oil & Gas EIDL Program application described in Paragraphs 22

through 25, on or about July 15, 2020, the SBA disbursed approximately $150,000 in loan benefits to account no. x1680, held by **Tolliver** at Bank 2.

### *Tolliver Oil & Gas PPP Application*

27. On or about May 14, 2020, **Tolliver** electronically submitted and caused to be submitted a false and fraudulent PPP application to Bank 3 in the name of Tolliver Oil & Gas PPP seeking approximately $664,724 in PPP funds ("Tolliver Oil & Gas PPP application"). **Tolliver** signed the Tolliver Oil & Gas PPP application and certified that the application and all information provided was true and accurate. Among other things, **Tolliver** certified that the funds would be used "to retain workers and maintain payroll," as well as for making other permissible expenses.

28. In the Tolliver Oil & Gas PPP application, **Tolliver** falsely represented that the company had 108 employees and that its average monthly payroll was approximately $265,889.60. In addition, **Tolliver** submitted a document that purported to be the company's Employer's Annual Federal Unemployment Tax Return ("IRS Form 940") for 2019. On the IRS Form 940, **Tolliver** falsely represented that, in 2019, **Tolliver** paid "$1,9263.75" to employees of Tolliver Oil & Gas.

29. At the time of the PPP application for Tolliver Oil & Gas, the company was administratively terminated by the Louisiana Secretary of State. As **Tolliver** knew at the time that he submitted the Tolliver Oil & Gas PPP application, Tolliver Oil & Gas had no employees or monthly payroll expenses. The IRS Form 940 that **Tolliver** provided in support of the company's PPP application was fictitious.

30. In the PPP application for Tolliver Oil & Gas, **Tolliver** also used the Social Security Number of a deceased person.

31. Based on **Tolliver's** material misrepresentations set forth in the fraudulent Tolliver Oil & Gas PPP application and supporting documents described in Paragraphs 27 through 30, on or about May 21, 2020, Bank 3 disbursed approximately $664,724 in loan benefits to account no. x3844, held by **Tolliver** at Bank 1.

### *Tolliver Petroleum PPP Application*

32. On or about June 16, 2020, **Tolliver** electronically submitted and caused to be submitted a false and fraudulent PPP application in the name of Tolliver Petroleum, from Ouachita Parish, Louisiana to Bank 4, seeking approximately $1,901,145 in PPP funds ("Tolliver Petroleum PPP application"). **Tolliver** signed the Tolliver Petroleum PPP application and certified that the application and all information provided was true and accurate. Among other things, **Tolliver** certified that the funds would be used "to retain workers and maintain payroll," as well as for making other permissible expenses.

33. In the Tolliver Petroleum PPP application, **Tolliver** falsely represented that the company had 70 employees and that Tolliver Petroleum's average monthly payroll was approximately $760,458. In addition, **Tolliver** submitted a document that purported to be the company's IRS Form 940 for 2019. On the IRS Form 940, **Tolliver** falsely represented that, in 2019, Tolliver Petroleum had made approximately $1,901,146.59 in payments to employees.

34. On the same date as the PPP application for Tolliver Petroleum, **Tolliver** filed articles of incorporation for Tolliver Petroleum with the Louisiana Secretary of State.

35. As **Tolliver** knew at the time that he submitted the Tolliver Petroleum PPP application, Tolliver Petroleum had no employees or monthly payroll expenses. The IRS Form 940 that **Tolliver** provided in support of the company's PPP application was fictitious.

36. In the PPP application for Tolliver Petroleum, **Tolliver** also falsely stated that he did not own any other businesses, and he used a Social Security Number for a deceased person.

37. The Tolliver Petroleum PPP application was not approved or funded.

### Scope of Scheme

38. In addition to the Tolliver Oil & Gas EIDL Program application, the Tolliver Oil & Gas PPP application, and the Tolliver Petroleum PPP application, from in or around April 2020, and continuing through at least in or around July 2020, **Tolliver** submitted and caused the submission of at least seven additional fraudulent PPP and EIDL Program applications.

39. In total, based on the approximately nine fraudulent PPP and EIDL Program applications **Tolliver** submitted and caused to be submitted, **Tolliver** fraudulently sought at least $7,607,096 in PPP and EIDL Program loans and obtained at least $1,114,724 in loan benefits.

## Use of Proceeds

40. After obtaining the fraudulent loan benefits, **Tolliver** transferred the funds to other bank accounts and made payments on vehicles, including a 2020 Cadillac CT5 and a 2021 GMC Sierra 1500; watches, including two Tissot and two Tag Heuer watches; and All-Terrain Vehicles ("ATVs"), including two 2021 Honda Rubicon ATVs and one 2021 Honda Pioneer ATV.

## Interstate Wire Communications

41. Beginning in or around April 2020, and continuing through in or around at least July 2020, in the Western District of Louisiana and elsewhere, the defendant,

**MICHAEL ANSEZELL TOLLIVER,**

having knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and attempting to do so, did knowingly transmit and cause to be transmitted, by means of wire communications in interstate commerce, writings, signals, pictures, and sounds for the purpose of executing such scheme and artifice.

42. On or about the dates specified below, in the Western District of Louisiana and elsewhere, **Tolliver**, for the purpose of executing and attempting to execute the scheme described in Paragraphs 19 through 40 of this Indictment, submitted and caused to be submitted by means of wire communication in interstate commerce the writings, signals, and pictures described below for each count, with each transmission constituting a separate count:

| Count | Approximate Date | Description of Wire |
|---|---|---|
| 1 | May 21, 2020 | Payment of approximately $664,720 from Bank 3, located outside the State of Louisiana, into **Tolliver's** account no. x3844 at Bank 1 |
| 2 | July 15, 2020 | Payment of approximately $150,000 from the SBA, located outside the State of Louisiana, into **Tolliver's** account no. x1680 at Bank 2 |

Each of the above is a violation of Title 18, United States Code, Section 1343.

### COUNTS 3-5
### Money Laundering
### [18 U.S.C. § 1957]

43.    Paragraphs 1 through 41 of this Indictment are re-alleged and incorporated herein by reference as though fully set forth herein.

44.    On or about the dates specified as to each count below, in the Western District of Louisiana and elsewhere, the defendant,

**MICHAEL ANSEZELL TOLLIVER,**

knowingly engaged and attempted to engage in monetary transactions by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the property involved in the monetary transactions was derived from some form of unlawful activity, as set forth below:

| Count | Approximate Date | Description |
|---|---|---|
| 3 | May 21, 2020 | **Tolliver** transferred and caused an electronic transfer of approximately $100,000 from account no. x3844 to account no. x3852, both held by **Tolliver** at Bank 3 |

| | | |
|---|---|---|
| 4 | June 25, 2020 | **Tolliver** deposited and caused the deposit of a cashier's check in the approximate amount of $500,065 from account no. x3844 held by **Tolliver** at Bank 3 into account no. x1680 held by **Tolliver** at Bank 2 |
| 5 | December 18, 2020 | **Tolliver** made and caused to be made a payment of approximately $14,164.84 from account no. x1680 held by **Tolliver** at Bank 2 on a 2021 GMC Sierra 1500 |

Each of the above is a violation of Title 18, United States Code, Section 1957.

## NOTICE OF FORFEITURE

45. Paragraphs 1 through 44 of the Indictment are re-alleged and incorporated by reference as through fully set forth herein for the purposes of alleging forfeiture to the United States.

46. Upon conviction of one or more of the offenses set forth in Counts One through Two of this Indictment, the defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A), and/or Title 18, United States Code, Section 981(a)(1)(C), the latter made applicable by Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to any of the said offenses, including but not limited to:

   a. Gross proceeds of the offenses held in account no. x1680 at Bank 2.

   b. One 2020 Cadillac CT5, VIN 1G6DN5RK8L0151745, purchase price of approximately $45,027.80, purchased from Ryan Chevrolet on or about November 21, 2020.

c. One 2021 GMC Sierra 1500, VIN 1GTU9FEL1MZ160502, purchase price of approximately $65,261.73, purchased from Jim Taylor Buick GMC on or about December 18, 2020.

d. One Tissot PR 100 T101.910.61.116.00 watch, purchase price of approximately $1,116, purchased from Hollis & Company on or about December 28, 2020.

e. One Tag Heuer Carrera WAR1314.BA0778 watch, purchase price of approximately $1,610, purchased from Hollis & Company on or about December 28, 2020.

f. One Tissot PR 100 T101.910.61.121.00 watch, purchase price of approximately $1,036, purchased from Hollis & Company on or about December 28, 2020.

g. One Tag Heuer Carrera WAR1353.BD0779 watch, purchase price of approximately $4,130, purchased from Hollis & Company on or about December 28, 2020.

h. One 2021 Honda Rubicon, Model ID TRX520FM6M, VIN 1HFTE456XM4600337, purchase price of approximately $11,412.30, purchased from Honda of Russellville on or about January 15, 2021.

    i. One 2021 Honda Rubicon, Model ID TRX520FM6M, VIN 1HFTE45F4M4600222, purchase price of approximately $11,957.30, purchased from Honda of Russellville on or about January 15, 2021.

    j. One 2021 Honda Pioneer 100-5 Deluxe, Model ID SXS10M5DM, VIN 1HFVE0428M4503301, purchase price of approximately $23,563.96, purchased from Honda of Russellville on or about January 15, 2021.

47. Upon conviction of one or more of the offenses set forth in Counts Three through Five of this Indictment, the defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), and/or Title 18, United States Code, Section 981(a)(1)(A), the latter made applicable by Title 28, United States Code, Section 2461(c), any property, real or personal, involved in such offense(s), or any property traceable to such property.

48. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

A TRUE BILL:

*REDACTED*

GRAND JURY FOREPERSON

ALEXANDER C. VAN HOOK
ACTING UNITED STATES ATTORNEY

_____
SETH D. REEG
ASSISTANT UNITED STATES ATTORNEY


JOSEPH S. BEEMSTERBOER
ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
UNITED STATES DEPARTMENT OF JUSTICE

For _____
JUSTIN M. WOODARD
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
UNITED STATES DEPARTMENT OF JUSTICE